May it please the Court, my name is Richard Timore and I'm representing the appellant in this matter, Curtis Carroll. Your Honor, this is another Batson-type issue for the Court to consider. My case arises out of the county of Alameda across the Bay. This involved a prosecutor striking seven African-American jurors rather than one. I don't want to reiterate my arguments in my brief. I think I fully briefed my arguments with respect to all seven of those African-Americans. All I have to show, though, is that only one of those African-American strikes was a pretext. I do want to talk a little bit about the background of the Batson in California courts. We learned from Johnson and the Supreme Court case in Johnson and this Court's decisions in Green and Ali and the California Supreme Court in Lennox in 2008 that over the last decade, the California Supreme Court or the California courts have not been, well, they've been struggling to deal properly with Batson challenges at the trial court and the appellate court level. And what they've been failing to do is they've been failing to take every single one, once a Batson challenge is done in trial court, is to take every single one of the prosecutor's proffered reasons and analyzing that reason based on all the direct and circumstantial evidence that's available, including a comparative jury analysis, to determine whether or not there was purposeful discrimination. And that's what happened in this case, Your Honor. This case is no different than Green and Ali. That step, the third step, and quite frankly, I agree with the Attorney General who was here before us as to where this Court has to deal with the issue before it, and that is the third Batson step. It's a de novo review at this point to answer Judge Smith's question, why should we not send this thing back down. One, it's impracticable to do that. It is 10 years old. Two, it's been fully briefed on this at this Court's level and in the district court's level, and it's, I mean, to have testimony given by the prosecutor 11 years afterwards, having been able to take a look at what we are arguing are the other, we're going to be back up here even if it does go down to the district court for findings. And so the Court's review, even if it goes back down to district court, is going to be a de novo review, and so we'll be back right back here where we started from. And so I would ask you. Kennedy, however, on this particular case, we do have, which I was trying to get your compatriot to really talk to me about with my questions, we do have a California Court of Appeal decision here which is subject to ad predeference and, in this particular situation, had all of the reasons in front of it and articulated a basis for it, didn't they? It did articulate a basis for it, Your Honor, but I would submit that they did not perform the review required under Miller L. and this Court's decisions in Ali and Green in terms of taking into consideration all of the things that were available before it in terms of a comparative jury analysis and some of the arguments that were made in, before this Court. Well, it seemed to me they did say that they thought a comparative jury analysis was of some value, but the California Court of Appeals didn't put much weight on such an analysis, and so they didn't put much weight on it. Well, they didn't, Your Honor. And if I recall, the California Court of Appeals, their decision was in 2002 before Miller L., before this Court's subsequent decisions in Green and Ali. And so I would, if it was, if it was today, I would question whether or not their analysis in the court of appeals would be the same. I don't think it would be. I think that they would do a better job after 10 years of litigation through the various courts about doing what the Supreme Court requires them to do under Miller L. and Batson. Well, however, it didn't seem to me that the California Court of Appeals at all ducked the issue about why the judge didn't do the right things. In fact, they say there's no reason for the judge to have gotten involved first, clearly gave speculative theories, should not have. Assumptions that the challenges were race-neutral doesn't suggest it entertained the defense motion with an open mind. The trial court was attempting to have it both ways by not finding a prima facie case and also asking the prosecutor to state his justifications. And then they went on to do the analysis. And at that point in time, the analysis that they gave was a direct, if you will, use of what the prosecutor had said when he finally got a chance to say anything and tried to make a decision about that. And now I do have it for review. And I don't disagree that the Court has that before you, Your Honor. I would say that there are things that the Court of Appeals missed. And I detail those things. But now I don't know quite what we're arguing about or what we're discussing. I mean, I think Judge Smith accurately reflected where we are today. That's what he said. And he said now he has a review to make. Now, why don't you say either why you disagree that there's that review, as he described it, or get to the reasons why the Court of Appeals was wrong? Factually, Your Honor, is that what you're asking me? Whatever your argument is about why we should reverse it. My argument, Your Honor, and I don't want to go over the seven. There's seven jurors. I've detailed all of those. Let me make this suggestion. Take what you think is the worst or best case from your point of view of a pretextual strike and how the Court of Appeals of California analysis doesn't meet snuff. Okay. Very well, Your Honor. Charles B. Charles B., if the Court will recall, he was a lifetime Republican. Well, that's enough reason to strike. If you're a defense attorney, probably, Your Honor. I was going to suggest that myself. He was a lifelong Republican. He'd served on three juries. His son was the victim of a crime, and he was a 30-year employee of the Federal Government. All of those things traditionally would be a prosecutor's dream juror. However, he was also African-American. The prosecutor gave four reasons why that particular juror was unacceptable. And I don't want to go over all of them because I see my time is going up, but the first one, he said he was acting strangely. He yelled in the back of the courtroom that he couldn't hear. That was strange. I don't know why that's strange. You want somebody who they can't hear say, you know, I can't hear. I want to participate in it. He's the prosecutor said that he was acting cavalierly when he said, I'm Charles B., Sr., not Jr. Well, the reason he said that was because his son, Charles B., Jr., was sitting as a juror in the same courthouse at the same time. There's nothing wrong with that. And this is the third proper reason, Your Honor, and I want to expand on what I said in my brief is that what the prosecutor says, and this is him speaking, he says he said that his daughter had been falsely accused of driving while black, and that happened in San Francisco. He also indicates that happens all the time, happens frequently in society. And so what is the prosecutor really saying there? What he's saying there is that you, Charles B., your daughter had an experience, a bad experience based on being black, and therefore, Charles B., you have a bad experience based on being black, and I'm going to strike you based on that experience. That, Your Honor, is clear to me that if it's not a strike based on race, it's certainly something that the court can consider to look at and say, this particular prosecutor had a racial mindset to begin with. And I didn't – I apologize. I didn't flush that argument out in my papers. It wasn't until I started looking at this and reflecting on my own experiences as a minority and discrimination that this came to me. And I wish I'd thought of it sooner, because I think it is important that he did have that mindset going forward. Lastly, Your Honor, I did want to just talk about briefly when the prosecutor was talking about his – all of the reasons why he struck the African-American jurors, he gave all of his reasons, and this is an excerpt of Record 377 of 386. He gave all the reasons, and he gave citations to California law, pinpoint citations saying what – of cases that said these strikes, these reasons for strikes are okay in California. And what can the court glean from that? The court can glean from that that this prosecutor wasn't just stating what his reasons were and then falling or rising on them. He went out to find a justification for the strikes of those African-American jurors. He – I've never seen that happen anywhere, and none of these cases before the courts that have addressed this did the prosecutor ever have citations to California law to justify why the strikes were okay. And the court can look at that to see – and look at what his mindset is. His mindset is somebody is trying to justify strikes, somebody who's trying to justify the strikes of African-Americans based on race. And I see that my time is up. Thank you. Thank you. May it please the Court. Good morning, Your Honors. I find it odd that an attorney would find fault with another attorney for citing citations to actions that he made, official actions that he knew would be reviewed by a trial judge and a court of appeal and many courts thereafter. The fact that this attorney, this district attorney, was extremely diligent and cited citations to the court justifying these particular challenges, I just find that an odd argument to make as impugning the honesty of the prosecutor. What do you think the effect is of the judge giving the reasons and then the prosecutor adopting them? I think there are a number of effects. First of all, I apologize. I don't mean to sound like I'm quibbling, but I don't think the prosecutor adopted the reasons. In fact, there are several reasons that the Court stated that the prosecutor that were low-hanging fruit for the prosecutor, he could have said, oh, yes, I agree with that. And he didn't, actually, several of the reasons that the Court stated he didn't. Well, what about the ones where he did say, oh, I know the reason you're doing that, and then the prosecutor said, yes. What's the effect of that? Well, the as Justice Klein in the Court of the California Court of Appeal pointed out, the trial judge here did mix together some of the functions, the steps of the VATS analysis. He seemed to be saying that because the reasons for the prosecutor's challenges were obvious, that meant that there was no preliminary showing of prima facie showing of discrimination, which obviously confuses two concepts. So finally, after commenting on what he thought the prosecutor's reasons were several times, the trial court began to realize he was doing something that he shouldn't be doing, and ultimately, for the last two challenges, he said, okay, I shouldn't be – he actually said in the record, I shouldn't be doing this. You should be giving the reasons. Why don't you give the reasons? And the prosecutor said, okay, I take that from your statement as stating that you have found a prima facie case. The prosecutor acknowledged that a prima facie case had been stated, and that's when he proceeded to give reasons for all seven of his – of his challenges. So I think that would supersede any impropriety of the trial court suggesting reasons, because the prosecutor stated the reasons he believed were good, didn't state some of the reasons that the trial judge attributed to him, and those are the reasons I believe we should be analyzing to see if they're protectual or unsupported by the record. Can we talk about one of them? How about potential juror Brown, a woman, former teacher? The 80-year-old with painful rheumatoid arthritis. Yeah. She said the physical problem was going up and down the stairs, but this was a courthouse with an elevator, right? Well, if, with all respect, if appellant had wished to make that argument, why did none of his – none of the three trial attorneys – this was a three-codefendant trial – none of the three very active, and if you read the record, very active, very committed Alameda County defense attorneys, none of them disputed that reason. We don't know on this record what the procedures were in the Alameda County courthouse. Perhaps there was a back staircase up to the jury assembly room, and the prosecutor didn't want these jurors wandering out in public. But you mean there are no elevators in that courthouse? We don't know where the elevators are, Your Honor. I assume there are elevators there, but they're probably in a public portion of the courthouse where the jurors could be contaminated by – there's three defendants with their family members, their witnesses, attorneys, members of the public. The prosecutor, obviously, any prosecutor wants to be able to do that. So you think no disabled persons can serve as jurors in that – in the Alameda courts? I'm sure that they can, Your Honor. This wasn't a disability case. This was a case about whether the social security – I'm sorry. Certainly, in terms of the Disabilities Act, the elevator would be available. And – But is the – does that mean the – I'm trying to understand what your argument is. Is it that no disabled persons can serve as jurors? Absolutely not, Your Honor. Well, if they can't use the stairs, are they eliminated? First of all, I would say that that seems to be a race-neutral reason. But that's not – Unless it's a pretext. Of course. Of course. Yes. If it were a pretext, why did none of the other attorneys say that this would be a problem? I don't know what the other attorneys did, but I'm – I just – I understand your argument that that's a valid reason to rule the juror because she can't climb stairs, assuming she couldn't climb stairs. Okay. Let me – let me say two things about that. First of all – Because I think there are two jurors that fall under this rule. First of all, let me take the argument head-on and say, yes, climbing up and down the stairs was a problem, but any prosecutor wants cohesion in his jury. He wants the jurors to be together. He prefers the jurors to move as a group, to think as a group, to cohere, because he's going to need a unanimous jury. You're saying prosecutors don't want disabled persons on juries in Alameda County? In this courtroom, the prosecutor would prefer jurors that would stay with a group of the other jurors. Did the prosecutor ask this juror during Vordaer whether her inability to use the stairs would affect her ability to serve as a juror? She said some days she would be able to use the stairs, some days not. She said that in her – in her questionnaire, as well as in her questioning My – my – I understand what she did say. I'm asking you if the prosecutor asked her if her impairment, partial or complete, would affect her ability to sit as a fair and impartial juror in this case. Did the prosecutor ask that specific question? Yes, sir. I don't believe he asked that specific question. However, the prosecutor did have a lot of information about this juror. Sure. As the trial court stated when he was preliminarily mistakenly stating his reasons why perhaps the prosecutor challenged her. If that was the real reason for striking Ms. Brown, why did he go on and say he also struck her because she's a schoolteacher? I think – I think it's – it's – if one could put oneself in the prosecutor – in a modern prosecutor's place just for a moment, the prosecutor knows how heavily scrutinized all of his decisions are going to be in these – in these cases. And how can we blame these prosecutors for saying, okay, this is why I did it? Okay. Maybe a court's not going to buy that. Here's another reason, too, because I was thinking that, too. What we know is the trial court said, after all the statements by the prosecutor, I – I accept these statements. I deny the Wheeler-Batson motion. That's a clear finding of fact by the trial court. He did allow a non-African American juror to sit who was also a schoolteacher, didn't he? No, he did not. That's a misstatement that's been repeated over and over again. Juror three? Yes. She was – had recently been hired as an aide in a preschool. She was not an 80-year-old former career schoolteacher, as Melba – Melba B. had been. To say that she was a schoolteacher is not even accurate on the record. She said she worked at a school and was an aide to teachers. She'd been doing it for two months at a preschool. There's no – there's no – as with all – and – and moving back to the substance of this case, as with all of the comparative analysis that was suggested by – by Appellant all throughout this case in the California Court of Appeal, which most certainly did do comparative analysis. And – and if you read the record, Justice Klein specifically stated that juror – that comparative analysis is a necessary and useful component. And if you read the concurrence of the Court of Appeal opinion, you'll see that he – that Justice Klein was taken to task by the other judges on that bench for doing comparative juror analysis when it wasn't expressly ordered by current – then-current president by the Supreme Court. So there's no question that Justice Klein – that Justice Klein took the comparative analysis extremely seriously. Appellant has stated no fact which he has suggested as a comparative analysis factor which Justice Klein did not specifically address and specifically for good reasons appearing in the record, as we've briefed already, reject. Kennedy, did Poindexter-Jackson, do I have the facts right, did she also? The reason was that she had a – who had back problems, who could not – who could not do a full-time job. She stated she could not work at a full-time job because of her – her health problems. This was a four-week trial in which, as the prosecutor stressed in his reasons, was going to be a mosaic. It was going to be a jigsaw puzzle of many small circumstantial pieces of evidence that wouldn't immediately be obviously relevant but had to be connected up. He needed jurors who could – who could concentrate as a full-time job for four weeks. This woman stated she could not work a full-time job because she had cerebral palsy, her – her leg fell asleep, and she had back problems. The trial judge accepted that as a reasonable reason. Was the reason given the trouble with the stairs? He threw that in, too. But the main point was he needed jurors that could concentrate. As with Melba, the 80-year-old with arthritis, as the judge pointed out, she had worked – she had fought hard to get a cause, a hardship excuse because of how bad her health problems were and how she did not want to sit on this jury. The prosecutor didn't want jurors on this jury that weren't willing to concentrate closely for four weeks on the evidence in this case. The trial court accepted those reasons. At minimum, the trial court's denial of the Batson motion was a statement of the sincere – his belief in the sincerity of the prosecutor. Perhaps we have to move further and say, okay, is there a pretext? Is there a – is there a lack of basis in fact in the record? We can – we can analyze those things by – by submission to the Court that there – there is no pretext. There's absolutely no comparative analysis that supports Appellant's arguments. And the other thing is, is it the State's position that given the errors that happened in the trial court, that nonetheless we have sufficient record to make that determination ourselves? In a word, yes. First of all, this Court certainly owes deference to Justice Klein's court of appeal opinion, which has – which presciently in 19 – in the early 2000s foresaw all the in the Ninth Circuit precedent in the last few years and saw beyond those, and did not violate any of the rules that even – even the Crittenden rule, because Justice Klein found no individual improper – probably improper motive. Therefore, it didn't – there's no violation of the Crittenden rule as – in terms of weighing and balancing. But I would – I would argue that there is some deference due to the State trial court. The State trial court found at minimum that the prosecutor's arguments were sincere. And I would argue that he also found, in terms of demeanor, that State – the State trial court saw Ms. Poindexter's health situation and came very close to giving her a hardship excuse. That's a – that's a finding on her demeanor. He found that Ms. – that several of the – of the witness – several of the jurors, including Charles B., had laughed raucously at a – at a question about whether they would believe police testimony. And if I could just make a point on Charles B. Charles B. not only mentioned that his daughter was – was found falsely accused of driving while black. He also said, when asked would he – how he would regard Oakland police officer testimony, he would take it not only with a grain of salt, he would take it with a shaker of salt. It was he who injected race into the situation, not the prosecutor. The prosecutor stated when he saw Mr. Blue's – Charles B.'s juror questionnaire before he got up and started answering questions, he liked him as a juror. He was a Republican. He was a long – he had a lifetime employment. It was only when Charles B. got up and started acting strangely, the prosecutor said, that he started questioning his – his usefulness as a juror. If the Court had no further questions, I submit. Thank you. Thank you, Your Honor. Your Honor, I don't have anything further unless the Court has other questions. Thank you very much. The case to his target will be submitted.
judges: Reinhardt, Hawkins, Smith N. R.